Robert W. PASTER et al., Appellants,

v.

C. Ed TUSSEY et al., Respondents,

and

Mr. and Mrs. Josephus Reynolds et al., Intervenors-Defendants (Partial) Appellants,

and

John C. Danforth, Attorney General of Missouri, Intervenor-Defendant Appellant.

No. 58149.

Supreme Court of Missouri,
En Banc.

July 30, 1974.

Rehearings Denied Aug. 26, 1974.

Frank Susman, Lawrence P. Kaplan, Irl B. Baris, Phillip J. Paster, Darwin Portman, St. Louis, for appellants.

Bernard J. Huger, St. Louis, Louis C. DeFeo, Jr., Jefferson City, for intervenors-defendants appellants Reynolds and others.

John C. Danforth, Atty. Gen., D. Brook Bartlett, First Asst. Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for intervenor-defendant appellant John C. Danforth.

Edward W. Garnholz, Gus O. Nations, Clayton, Elvis A. Mooney, Bloomfield, Samuel J. Molby, Kansas City, for Missouri Friends of the Public Schools.

G. Dennis Sullivan, Kansas City, amicus curiae.

MORGAN, Judge.

This appeal involves questions as to whether or not the provisions of the Missouri Constitution of 1945 and the First and Fourteenth Amendments to the United States Constitution prohibit, permit or require the lending of school textbooks to pupils and teachers who, respectively, attend or teach in non-public schools (not operated for profit) as required by Senate Bill 638, 76th General Assembly (Second Regular Session, 1972)—now designated as §§ 170.051 and 170.055, RSMo 1969, V.A. M.S. Such issues were tried in a declaratory judgment action wherein the trial court upheld the constitutionality of the

statutory enactments noted in so far as they applied to pupils. Jurisdiction of the appeal therefrom is in this court by virtue of Article 5, § 3 of the Missouri Constitution, V.A.M.S.

Prior to the enactment of Senate Bill 638, statutory provisions for the providing of school textbooks in this state were detailed in § 170.051 (now repealed) and read as follows:

1. Each school board shall purchase from the free textbook fund and from the incidental fund of the district if the free textbook fund is insufficient and furnish free all of the textbooks for all the pupils in the elementary grades of the public schools of the district. The board may provide texts, supplementary texts, library and reference books, and additional instruction supplies, for all the pupils of the district, but funds shall not be expended for these materials for high school pupils until the needs of the elementary grade pupils have been adequately supplied. The books are the property of the district but shall be furnished to the pupils under rules and regulations prescribed by the school board.

2. When the money apportioned under the provisions of section 148.360, RSMo, is received by the treasurers of the various counties and the city of St. Louis, the county clerk of each county shall apportion the money among the various school districts in each county in the following manner: The amount to be apportioned to each school district shall be determined by multiplying the number of children on the last enumeration list of the school district by the ratio used by the state comptroller in making the distribution of the foreign insurance tax moneys among the counties of the state, and the county court shall order the county treasurer to place to the credit of the free textbook fund of each district, the amount thus obtained, or shall draw its warrant in favor of the proper township treasurer for the amount due the districts of the various townships, and shall

also draw its warrant in favor of the treasurer of any school district organized as a six-director district for the amount due the district and the money thus received shall be placed to the credit of the free textbook fund of the district.

3. No school board shall pay a higher price for books than is paid by any other school district in this state, or in any other state purchasing textbooks in the open market. No contract for books for a period of more than five years shall be made by any school district under the provisions of this law. Any owner, agent, solicitor or publisher of textbooks who shall offer for sale in this state or sell to any board of directors or board of education textbooks at a higher price than herein specified shall be guilty of a misdemeanor and shall upon conviction thereof be punished by a fine of not less than five hundred dollars and not more than ten thousand dollars for each offense.

The new statute, again identified as § 170.051, now reads as follows:

1. As used in this section, the following terms shall have the meaning indicated unless the context otherwise requires:

(1) "School" means any elementary or secondary school, public or non-public, nonprofit, within this state, and wherein a resident of the state may legally fulfill the compulsory school attendance requirements of section 167.031, RSMo.

(2) "Textbook" means workbooks, manuals, or other books, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is expected to be available for the individual use of each pupil in such class or group.

2. Each public school board shall purchase and loan free all textbooks for all children who reside in the district and

attend an elementary or secondary school in this state.

3. Textbooks shall be loaned to all pupils residing in the district on an equitable basis and without discrimination on the grounds of race, creed, color, national origin, or school attended.

4. Title to and control and administration of the use of all textbooks purchased under this section shall be vested in the public school board and shall be loaned free to pupils and teachers upon their request. The public school board may prescribe rules and regulations governing the loaning of textbooks.

5. No school board shall be required to purchase textbooks to be lent under the provisions of this section and section 170.055 from sources of revenue other than the free textbook fund, except that in addition to the textbooks purchased under this section and section 170.055, a school board may purchase from its incidental fund texts, supplementary texts, library and reference books and instruction supplies, for the use of pupils attending public schools only. In the event that the money from the free textbook fund is insufficient to purchase textbooks for all elementary and secondary pupils, then priority shall be given to elementary pupils.

6. Only textbooks which are filed with the state board of education pursuant to section 170.061, shall be purchased and loaned under this section. No textbooks shall be purchased or loaned under this section to be used in any form of religious instruction or worship.

7. Textbooks shall be purchased from the free textbook fund. No portion of the public school fund referred to in section 5, Article IX constitution of this state, shall be used to pay the cost of textbooks under this section nor shall funds under this section be in any way commingled with the public school fund.

The new § 170.055 is only a re-enactment of subsections 2 and 3 of repealed § 170.051, as they existed prior to passage of Senate Bill 638, and thus has no relevant significance to the questions presented. In each instance, the basic source of revenue for the free textbook fund is the tax imposed by the state on foreign insurance companies for "business done in this state" as provided in § 148.340.

As would be apparent, the constitutional challenge to the two new sections is directed toward the mandate therein that textbooks be provided to pupils attending private schools (not operated for profit)—including parochial and otherwise; and, in that connection, we would be remiss in not acknowledging the assistance derived from the excellent arguments and briefs of the parties, the Attorney-General (who intervened to argue for the constitutionality of the statutes), and Amici Curiae. Each has sought to interpret the prevailing law, both federal and state, by reference to many decisions handed down by the courts of this country.

As a state court we are charged, primarily, with the duty of ruling on the constitutional validity of the legislative enactments herein challenged in light of those provisions of the Missouri Constitution which are relevant thereto. If such constitutional provisions proscribe the same, we have no alternative in the performance of that duty but to so rule, unless and until such provisions have been made inoperative by the United States Constitution as interpreted and construed by the Supreme Court of the United States or the people of Missouri have amended the same.

For simplicity of reference, we set out portions of the Missouri Constitution found in Article I (captioned—Bill of Rights), Article IX (captioned—Education) and Article X (captioned—Taxation):

Art. I, § 6:

That no person can be compelled to erect, support or attend any place or sys-

tem of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same.

Art. I, § 7:

That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.

Art. IX, § 1(a) (in part):

A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law.

Art. IX, § 5:

The proceeds of all certificates of indebtedness due the state school fund, and all moneys, bonds, lands, and other property belonging to or donated to any state fund for public school purposes, and the net proceeds of all sales of lands and other property and effects that may accrue to the state by escheat, shall be paid into the state treasury, and securely invested under the supervision of the state board of education, and sacredly preserved as a public school fund the annual income of which shall be faithfully appropriated for establishing and maintaining free public schools, and for no other uses or purposes whatsoever.

Art. IX, § 8:

Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any county, city, town, or other municipal corporation, for any religious creed, church, or sectarian purpose whatever.

Art. X, § 1:

The taxing power may be exercised by the general assembly for state purposes, and by counties and other political subdivisions under power granted to them by the general assembly for county, municipal and other corporate purposes.

Art. X, § 3:

Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. All taxes shall be levied and collected by general laws and shall be payable during the fiscal or calendar year in which the property is assessed. Except as otherwise provided in this constitution, the methods of determining the value of property for taxation shall be fixed by law.

It has long been recognized in Missouri that ". . . the public schools have been intrenched as a part of the state government and it is thoroughly established that they are an arm of that government and perform a public or governmental function . . .," City of Edina, Etc. v. School District, Etc., 305 Mo. 452, 267 S.W. 112, 115 (banc 1924), and more recent decisions of this court have reaffirmed the principle that supporting the public educational process is a governmental activity. All pupils are free to participate therein.

This court said in Harfst v. Hoegen, 349 Mo. 808, 163 S.W.2d 609 (banc 1942) at 1. c. 612–614: "Missouri follows generally the usual pattern of religious guaranties and safeguards in its Constitution, * * * It forbids a school district to make payments from any public funds to sustain any private or public school controlled by any sectarian denomination. * * *

"But our Constitution goes even farther than those of some other states. In addition to the provisions already mentioned we have still another. Art. II, Section 7 [now Art. I, § 7] says: 'That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.' Thus, we have an explicit interdiction of the use of public money for a teacher of religion as such which has been violated by the board. * * * *The constitutional policy of our State has decreed the absolute separation of church and state, not only in governmental matters, but in educational ones as well.* Public money, coming from taxpayers of every denomination, may not be used for the help of any religious sect in education or otherwise. If the management of this school were approved, we might next have some other church gaining control of a school board and have its pastor and teachers introduced to teach its sectarian religion. Our schools would soon become the centers of local political battles which would be dangerous to the peace of society where there must be equal religious rights to all and special religious privileges to none. The faithful observance of our constitutional provisions happily makes such a condition impossible.

"It is of no purpose to discuss or decide other questions raised except to point out that the long acquiescence of appellants in the management of the school cannot make such management proper. No one may waive the public interest; the constitutional provisions are mandatory and must be obeyed." (Emphasis added.)

This court in Berghorn v. Reorganized School Dist. No. 8, 364 Mo. 121, 260 S.W. 2d 573, 1. c. 582–583 (1953), affirmed the trial court's reasoning, as follows: "The trial court construed Article I, Sections 5–7, and Article IX, Section 8 of the Constitution of Missouri 1945 to mean 'that the State of Missouri has a fixed and definite policy to maintain free public schools separate and apart from all religious, church or sectarian activities and influences to the end that absolute freedom of choice of religion and freedom of worship shall be unaffected by any religious influences, activity, proselyting example and indoctrination through and intrusion into the free public school system of the State of Missouri. * * * That it is the unqualified policy of the State of Missouri that no public funds or properties, either directly or indirectly, be used to support or sustain any school affected by religious influences or teachings or by any sectarian or religious beliefs or conducted in such a manner as to influence or predispose a school child towards the acceptance of any particular religion or religious beliefs; * * *.' "

In McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927 (banc 1953), this court held that transportation of parochial school pupils was an expenditure of public school funds for other than the maintenance of free public schools as directed by the constitution of this state.

Although involving a different factual situation, the holding in the McVey case was re-affirmed and followed in Special Dist. For Ed. & Tr. of Hand. Child. v. Wheeler, 408 S.W.2d 60 (Mo. banc 1966). See also McDonough v. Aylward, 500 S. W.2d 721 (Mo.1973).

From all of which, it becomes readily apparent that the provisions of the Missouri Constitution declaring that there

shall be a separation of church and state are not only more explicit but more restrictive than the Establishment Clause of the United States Constitution. That such is true was recognized and appreciated recently by the Supreme Court of the United States in Wheeler v. Barrera, —— U.S. ——, 94 S.Ct. 2274, 41 L.Ed.2d 159 (Slip Opinion, dated June 10, 1974). See also Brusca v. State of Missouri ex rel. State Bd. of Ed., 332 F.Supp. 275 (E.D.Mo. 1971), affirmed, 405 U.S. 1050, 92 S.Ct. 1493, 31 L.Ed.2d 786 (1972), and Luetkemeyer et al. v. Kaufmann et al., 364 F. Supp. 376 (W.D.Mo.1973). Keeping in mind this existing historical background, we consider the arguments of the parties.

Defendants and the Attorney-General seek to distinguish each of the Missouri cases mentioned. They submit that the Harfst and Berghorn cases rejected direct financing of the total educational program of non-public schools; that the Special District case considered special educational services; that the McVey case ruled a single issue, i. e., that funds could not be taken from the Public School Fund to transport pupils to private schools as such an expenditure was not for the purpose of maintaining free public schools; and, that none of them involved providing textbooks. The latter statement is certainly true, but, even though such cases may be distinguished factually it does not follow that they do not provide guidelines for construing the constitution of this state in resolving the instant case. In arguing further, it is suggested that if tax revenues for providing transportation for private pupils had been placed in a special fund, and not commingled with the Public School Fund, that the expenditure found unconstitutional in McVey presumably could have been upheld. The presumption having been made is then applied to the textbook question. A portion of the printed argument declares: "We readily agree that the funds which school districts obtain by levy, and their mandatory share of state revenues, may not be used for any purpose not related to the pub-

lic schools. * * * We would also agree that any funds in excess of the constitutional minimum which the General Assembly provides to school districts for school purposes may not be used for other purposes. * * * But the funds available for the purchase of textbooks are not of that sort. They come from proceeds of a particular tax which are subject to the complete control of the legislature. The legislature has made the fund available for one particular purpose—the purchase of textbooks to be loaned to pupils in all schools of the state. The legislature has not made the fund available for general school purposes. The funds never become school funds. McVey v. Hawkins [364 Mo. 44], 258 S.W.2d 927 (Mo.1973), and related cases simply do not apply to this situation. The funds have never become school funds."

As shown by the Memorandum Opinion filed, the trial court followed the same theory in concluding that: "The funds made available for use by the school districts under Senate Bill 638 came from the Free Textbook Fund which in turn receives its money from the premium taxes collected from foreign insurance companies. Senate Bill 638 goes to great lengths to require the school districts to keep their Free Textbook Funds separate from their Public School Fund monies. The Bill provides that the textbooks to be loaned shall be purchased only from the Free Textbook Fund. We [the trial court] find no violation of Article IX, Section 5, and no invasion of the sacred trust under which the Public School Funds are held."

For an opposite view, we quote from one of the briefs of Amici as follows: "The 1972 Missouri textbook law raises a false issue and sets a dangerous precedent when, calling for an antiseptic separation of free textbook funds from 'the public school fund referred to in section 5, article IX' (Sec. 170.051, sub. 7), it implies that tax funds may be used to finance education in church-related and non-public schools if the money comes from some public fund

other than one referred to in Article IX, Section 5. As already noted, this constitutional provision is rather broad, including 'all moneys . . . belonging to or donated to any state fund for public school purposes.'" The thrust of the argument is that textbooks are a basic and integral part of the educational process just as much as desks, blackboards and other facilities; and, that carving out any one item from that process, for special treatment, is violative of the constitutional mandate that the state will finance the educational process solely in public schools open to all.

At this point, we do make the comment that determining the extent to which the legislature may compartmentalize tax revenues and appropriate the same for specified purposes is not the ultimate issue for decision. The question is whether or not the result, flowing therefrom, is violative of any provision of the state constitution.

Before resolving the state question, we look to federal cases relied on by the parties. Defendants submit that Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (wherein a textbook law of New York was approved as not violative of the Establishment Clause even though textbooks were provided to pupils attending church-related non-public schools) is controlling, and quote the following therefrom, l.c. 243, 88 St.Ct. l.c. 1926:

> The law merely makes available to all children the benefits of a general program to lend schools books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools.

The rationale of the Allen opinion is recognized as being based on the "pupil benefit" theory or the "pupil-parent benefit" theory even though an indirect benefit to the private school was acknowledged.

Plaintiffs suggest somewhat of a limitation was placed on such theories by the Supreme Court in Norwood v. Harrison, 413 U.S. 455, at l.c. 463, 93 S.Ct. 2804, at l.c. 2810, 37 L.Ed.2d 723 (1973), when it said:

> A textbook lending program is not legally distinguishable from the forms of state assistance foreclosed by the prior cases. Free textbooks, like tuition grants directed to private school students, are a form of financial assistance inuring to the benefit of the private schools themselves.
>
> An inescapable educational cost for students in both public and private schools is the expense of providing all necessary learning materials. When, as here, that necessary expense is borne by the State, the economic consequence is to give aid to the enterprise.

Defendants distinguish the holding in the Norwood case from the Allen case by pointing out that in the former: "The Court held that to sanction the textbook aid would permit the state to do indirectly that which it was expressly forbidden to do directly—to promote racially segregated schools." See dissent of Justice Douglas in Wheeler v. Barrera, supra.

Some of the other federal cases relied on by the parties include: Committee for Public Schools v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); Levitt v. Committee for Public Education and Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). All of the cases

cited, including those state cases from other jurisdictions, and other federal cases have been considered. From all of which, two deductions may be made: one, when approval is given for the diversion of public tax revenues to any phase of the educational process not related to the public school system a very tenuous constitutional position is created—referred to in the cases noted, generally, as "verging" on unconstitutionality; second, disposition of the instant case is not controlled by federal law nor have the relevant portions of the Missouri Constitution been made inoperative. For instance, as said by Chief Justice Burger in the Norwood case, supra, 413 U.S. at l.c. 462, 93 S.Ct. at l.c. 2809:

> In Pierce [Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)], the Court affirmed the right of private schools to exist and to operate; it said nothing of any supposed right of private or parochial schools to share with public schools in state largesse, on an equal basis or otherwise. It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.

Again, as said recently in Luetkemeyer v. Kaufmann, supra, "The fact that Missouri has determined to enforce a more strict policy of church and state separation than that required by the First Amendment does not present any substantial federal constitutional question."

We return to Missouri law to resolve the issues presented and reach the following conclusions.

■ 1. That portion of § 170.051, subpara. 4, requiring public school boards to provide textbooks to teachers in private schools "upon their request" is violative of Art. I, § 6 of the Missouri Constitution prohibiting the "support" of any "teacher of any sect."

■ 2. Those portions of § 170.051 requiring public school boards to provide textbooks to pupils attending private schools are violative of Art. IX, § 8, of the Missouri Constitution (heretofore quoted) which, in part, provides: "Neither the general assembly, nor . . . [other governmental units] shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose . . ." Obviously, if the expenditures called for in § 170.051 were considered as in aid of a church, this section, as well as others herein quoted from the Missouri Constitution, would make the statute unconstitutional. However, for the purposes of this case we have applied the "pupil-parent benefit" theory, without deciding if we were at liberty to do so in light of the absolute separation of church and state doctrine evidenced throughout the Missouri Constitution, to the statute and Art. IX, § 8. Is the expenditure of funds to the pupil-parent in aid of a sectarian purpose? Which, in turn, calls for deciding whether or not an individual can have a sectarian purpose, or whether or not only a "sect" can have such a purpose. When a sect, be it religious, political or otherwise, establishes a school for promoting and perpetrating the tenets of the sect a sectarian purpose is evident. If such a purpose did not exist, it would be totally illogical for the sect to assume the financial burden of providing a school for its followers. In the instant case, most of the schools, denominated as private, have the worthy objective of providing pupils with an education at a place permeated with a religious atmosphere. To succeed, or even exist, such a school must have pupils (or parents thereof) who are adherents of the same sectarian purpose. Individuals, acting individually or collectively, can have and promote a sectarian purpose, and by

attending a private school designed for such a purpose do, in fact, promote the sectarian objective for which Art. IX, § 8, prohibits the expenditure of any public funds.

3. Whether or not other provisions of the Missouri Constitution prohibit the expenditure of public funds as proposed by § 170.051 need not be resolved at this time.

4. This case involves the expenditure of "state" funds and not the expenditure of "federal" funds.

5. Those portions of the statute herein found unconstitutional pertain solely to expenditures to pupils and teachers of private schools. There is nothing in the record to indicate that § 170.051 would not have been enacted by the General Assembly had it known such portions were invalid; and, we are assured of this by reason of the fact that after such portions are excised the statute will have the same effect that it did prior to the amendment thereof.

Although parents who send their children to private schools bear the burden of supporting such institutions, as well as the public schools, the additional burden is self-imposed. That such a sacrifice has been made by so many through the years makes it self-evident that individuals, as such, do act and live with a sectarian purpose in the area of education—an objective which the people of Missouri, speaking through their constitution, have protected fully but also have declared to be one personal to the individual.

From the many cases written on the subject, as well as from published legal writings, two schools of thought thread their way throughout. One, the additional burden has been carried too long by those supporting private schools and it would be better to assist them in that effort than to have private schools close and thus increase the tax revenue expenditures for public schools. Second, there are those that appreciate the great contribution made by persons supporting private schools but,

the taxation question aside, believe that religious freedom can be preserved better by not bringing government into the private school—the latter thought being based on the "carrot and stick" idea that it is common knowledge that acceptance of "government funds" is with certainty immediately followed by "government controls."

This court does not have the privilege, as do individuals, of selecting what it might think was the most meritorious approach to an ever existing problem, but it is bound in the resolution of legal conflicts stemming therefrom to follow the dictates of the Missouri Constitution as now written.

The judgment is reversed, except to the extent it prohibited expenditures of funds to teachers in private schools, and the cause is remanded with directions for entry of judgment in accordance with this opinion.

DONNELLY, C. J., and SEILER, HOLMAN, HENLEY and FINCH, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

BARDGETT, Judge (dissenting).

I respectfully dissent. The provisions of section 170.051, as amended in 1972 by Senate Bill 638, the statute under attack, have been set forth in the principal opinion and need not be repeated here.

The contention that Senate Bill 638 as it applies to nonpublic school students is violative of the First Amendment, United States Constitution, clearly has no merit. In Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the United States Supreme Court upheld the constitutionality of a New York statute as against a First Amendment attack. The New York statute is, in substance, the same as Senate Bill 638. As of February 1, 1973, fourteen states had enacted laws

providing for the furnishing of textbooks and instructional material to pupils of non-public schools. Committee for Public Education v. Nyquist, 413 U.S. 756 (1973), loc.cit. 815–816, footnote 2, 93 S.Ct. 2955, 37 L.Ed.2d 948. The principal opinion seems to allow for the inference that the U.S. Supreme Court has modified the holding of *Allen* in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1972). *Norwood* was an equal protection case. It involved the loaning of books by the State of Louisiana to public and nonpublic school children. The court did not declare the Louisiana statute to be violative of the First Amendment nor was the statute held unconstitutional on any other ground. The *practice* of the State of Louisiana in furnishing textbooks to certain nonpublic schools which engaged in racial discrimination on admission was held to violate the equal protection clause of Amendment Fourteen, U.S. Constitution, and therefore was an activity which a state could not engage in nor lend its aid to by the furnishing of school books.

In *Norwood* the court *relied* upon *Allen* in upholding the constitutionality of the school-book statute and in remanding the case to the District Court for the purpose of permitting the District Court to determine whether a particular participating nonpublic school was practicing racial discrimination in its admission policies. If the school was not engaged in racially discriminatory admission practices, the state-supplied-school books were to be made available to the students of that school. The quotation from *Norwood* appearing in the principal opinion that, "A textbook lending program is not legally distinguishable from the forms of state assistance foreclosed by the prior cases," does not deal with the type of statute before this court and does not refer to the subject matter of *Allen*. The "prior cases" referred to must be read in context with the sentence preceding the quotation which is, "This Court has consistently affirmed decisions enjoining state tuition grants to stu-dents attending *racially discriminatory private schools*." (Emphasis added.) The cases referred to are listed in footnote 6 and they involved racial discrimination.

*Norwood* stands for the proposition that a state cannot use public resources in furtherance of a constitutionally impermissible objective even though the means in and of themselves are constitutionally permissible. In other words, a state may utilize public monies in aid of a public transportation system, such as Bi-State in Missouri, because a statute so providing would be constitutional. But the state could not do so if the transportation system practiced racial discrimination in admitting or seating passengers aboard its vehicles because the discriminatory practice would violate the equal protection clause of Amendment Fourteen.

In order for the U.S. Supreme Court to have reached the result it did in *Norwood,* it was necessary that the holding in *Allen* be reaffirmed and not modified. This is so because the court affirmatively authorized the distribution of books to nonpublic school children attending nonpublic schools which were not engaged in racially discriminatory admission practices.

As noted, *Allen* involved a statute of New York which is basically the same as Senate Bill 638. The New York Court of Appeals in Board of Education of Central Sch. Dist. No. 1 v. Allen, 20 N.Y.2d 109, 281 N.Y.S.2d 799, 228 N.E.2d 791 (1967), held that the New York loaned-books statute did not offend the New York constitutional provisions.

Article XI, section 3, of the New York Constitution provides:

"Neither the state nor any subdivision thereof shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious

denomination, or in which any denomination tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning."

Except for the provision relating to transportation of school children, the New York provision is certainly just as restrictive as Art. IX, sec. 8, Mo.Const.1945, set forth in the principal opinion. There is no material difference between the proscriptive language of the New York provision which prohibits the state from using its property credit or any public money—directly or indirectly in aid of—any school —wholly or in part under the control of any religious denomination, or in which any denominated text or tenet is taught, and the provisions of Art. IX, sec. 8, Mo. Const., which prohibits the general assembly from making any appropriation or paying from any public fund whatever, anything in aid of any religious creed, church, or sectarian purpose or to sustain any private school, or other institution of learning controlled by any religious creed, church, or sectarian denomination whatever.

In *Allen* the New York Court of Appeals held, 281 N.Y.S.2d 799, 804, 228 N.E.2d 791, 794:

"The purpose underlying section 701, found in the Legislature's own words (L. 1965, ch. 320, sec. 1, supra), belies any interpretation other than that the statute is meant to bestow a public benefit upon all school children, regardless of their school affiliations. There can be no serious suggestion that the declaration of purpose by the Legislature was a verbal smoke screen designed to obscure a nefarious scheme to circumvent the New York State Constitution. No one in the last third of the 20th Century can doubt that a program aimed at improving the quality of education in all schools is a matter of legitimate State concern.

"Since there is no intention to assist parochial schools as such, any benefit accruing to those schools is a collateral effect of the statute, and, therefore, cannot be properly classified as the giving of aid directly or indirectly."

The New York court further observed, "Children often, then, fulfill assignments for courses in both public and private schools by means of using and borrowing from public libraries. We do not consider this indirect aid to private or parochial schools." 281 N.Y.S.2d 804, 228 N.E.2d 794. The same, of course, is true in Missouri.

The New York court concluded that its school-book statute entails no aid to parochial schools and upheld the statute under the New York and United States Constitutions.

On appeal to the U.S Supreme Court in Bd. of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the question was principally whether the New York school-book statute offended Amendment One of·the U.S. Constitution. The U.S. Supreme Court placed principal reliance upon Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). In that case the court upheld a New Jersey law under which New Jersey provided for the transportation of all children to all schools. The court said, 392 U.S. at 243, 88 S.Ct. at 1926: "The statute upheld in *Everson* would be considered a law having 'a secular legislative purpose and a primary effect that neither advances nor inhibits religion.' We reach the same result with respect to the New York law requiring school books to be loaned free of charge to all students in specified grades. The express purpose of § 701 was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains,

at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools. Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution."

Thus it appears that the New York Court of Appeals and the United States Supreme Court used essentially the same criteria in holding the statute constitutional—that the benefit was to the child and not to the school.

The principal opinion suggests that the provisions of the Missouri Constitution declaring that there shall be a separation of church and state are more explicit and restrictive than the establishment clause of the U.S. Constitution. It is obvious that more words appear in the Missouri Constitution than in the U.S. Constitution and, therefore, it can be said to be more explicit. However, I suggest that the reason for this is that the state operates a public-school system whereas the federal government does not do so. I disagree with the suggestion in the principal opinion that the establishment clause of the U.S. Constitution, as construed by the U.S. Supreme Court, is less restrictive than the provisions of the Missouri Constitution. In any event, Wheeler v. Barrera, — U.S. —, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), principally concerned Art. IX, sec. 5, Mo. Const.1945—not the establishment clause of the Mo. Constitution. (at —, 94 S.Ct. 2274.) And the question of the impact, if any, of Art. IX, sec. 5, Mo.Const.1945, on the use of purely federal funds under Title I of the Elementary & Secondary Education Act of 1965, as amended 20 U.S.C. sec. 241a et seq., has yet to be determined. Wheeler v. Barrera, supra, at —, 94 S.Ct. 2274.

The fact remains that the subject matter of Senate Bill 638 was held in Cochran v. Louisiana Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930), in considering the provisions of the Louisiana loaned-textbook law thirty-four years ago, to be for a public purpose, and this was reaffirmed in Board of Education v. Allen, 392 U.S. 236, 247, 88 S.Ct. 1923, 20 L.Ed. 2d 1060 (1967), and Norwood v. Harrison, 413 U.S. 455, 468, 93 S.Ct. 2804, 37 L.Ed. 2d 723 (1973).

Nowhere does the Missouri Constitution prohibit the reception of an incidental benefit to a religious institution which may flow from a legislative act which act has a legitimate and constitutional public purpose. The public purpose of Senate Bill 638 is the state's interest in the quality of secular education which, under Missouri laws, can be received by children by attending nonpublic schools and thereby satisfy the requirements of our compulsory attendance law—sec. 167.031, RSMo 1969.

The direct beneficiary of Senate Bill 638 is the child and not the school or religious institution. *Cochran,* supra, *Allen,* supra, Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655 (1929), infra, and Chance v. Mississippi State Textbook Rating & Purchasing Board, 190 Miss. 453, 200 So. 706 (1941), infra.

In Borden v. Louisiana State Board of Education, *supra,* the Supreme Court of Louisiana had before it a Louisiana statute which provided books to all children, including those attending church-related nonpublic schools. The attack upon the statute relevant to our case was that it violated secs. 4, 8, 12, and 14 of Art. 4 of the Louisiana Constitution. The Louisiana Supreme Court summarized those provisions at 123 So. 660 as follows: "Section 8 of article 4 prohibits, among other things, the taking of money from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religion, or in aid of any priest, preacher, minister, or teacher of religion as such, or for private, charitable, or benevolent purposes to any person or community, excepting cer-

tain institutions conducted under state authority. Section 4 of article 1 relates to the right to worship God according to the dictates of one's own conscience, and prohibits the passage of laws establishing religion, or the free exercise thereof, or the granting of preferences to, or making discriminations against, any church, sect, or religious creed. Section 13 of article 12 prohibits the using of public funds for the support of any private or sectarian school. Section 12 of article 4 prohibits, among other things, the lending, pledging, or granting the funds, credit, property, or things of value of the state or of any political corporation thereof to or for any person or persons, association, or corporation, public or private."

It is immediately apparent that the provisions of the Louisiana Constitution and the provisions of the Missouri Constitution are practically identical. Indeed, it would appear that one was copied from the other. The significance of the *Borden* decision by the Supreme Court of Louisiana is that it is a case in which the constitutional provisions are the same as Missouri's and the constitutional attacks upon the statute are the same as in this case.

The Louisiana Supreme Court upheld the statute saying that the appropriation of money was not for the use of any church, priest, sectarian or even public schools. "The appropriations were made for the specific purpose of purchasing school books for the use of the school children of the state, free of cost to them. It was for their benefit and the resulting benefit to the state that the appropriations were made." 123 So. 660. The court further held that the statute did not grant or donate the books to private persons but only loaned them to the children and that the funds from which the appropriations were made were not part of the public school fund.

It was also contended that the Louisiana act violated the due process clause of the Louisiana Constitution in that the taxes cannot be levied or expended for any but a public purpose. The court held that the expenditure of public funds for the school books was a public purpose.

Cochran v. Louisiana State Board of Education, 168 La. 1030, 123 So. 664 (1929), was a companion case to *Borden,* supra, and adopted the opinion in *Borden.* *Cochran* was appealed to the United States Supreme Court (Cochran v. Louisiana Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930).) The U.S. Supreme Court unanimously affirmed the holding that the taxing power of the state of Louisiana had been executed for a *public* purpose saying that the interest of the statute "is education, broadly; its method comprehensive. Individual interests are aided only as the common interest is safeguarded." 281 U.S. at 375, 50 S.Ct. at 336.

In Chance v. Mississippi State Textbook Rating & Purchasing Board, 190 Miss. 453, 200 So. 706 (1941), the Mississippi Supreme Court upheld a state textbook law which provided books to children attending church-related nonpublic schools. The court based its decision upon the "child benefit theory", holding that the schools were not the beneficiaries of the act and that the lending of books to individual pupils was not a direct or indirect aid to the respective schools which they attended. The Mississippi Supreme Court considered the opinion of the Louisiana Supreme Court in *Borden,* supra, and the United States Supreme Court's opinion in *Cochran,* supra, authoritative, saying that the constitutional and statutory provisions of Mississippi and Louisiana, for all practical purposes, are identical. 200 So. at 712.

In Bowerman v. O'Connor, 104 R.I. 519, 247 A.2d 82 (1968), the Rhode Island Supreme Court upheld a state textbook law similar to the New York law which was the subject of *Allen,* supra, on the authority of *Allen.* The only similar case to the contrary is Dickman v. School District No. 62C, Oregon City, of Clackamas County, 232 Or. 238, 366 P.2d 533 (1961), and that case was decided before *Allen,* supra.

The opinions of the Supreme Court of Louisiana in *Borden,* supra, the Supreme Court of Mississippi in *Chance,* supra, and the New York Court of Appeals in *Allen,* supra, are significant because the pertinent constitutional provisions of those states are similar to Missouri's and the courts of these states have upheld loaned-school-textbook laws.

In Hickey v. Board of Education of City of St. Louis, 363 Mo. 1039, 256 S.W.2d 775 (1953), this court said at 778: " 'It is a fundamental principle of constitutional law that a State Constitution is not a grant of power as is the Constitution of the United States but, as to legislative power, it is only a limitation; and, therefore, except for the limitations imposed thereby, the power of the State Legislature is unlimited and practically absolute.' . . . Those limitations must be 'expressed in the Constitution or clearly implied by its provisions.' . . . A statute will not be held unconstitutional unless it *clearly and undoubtedly* contravenes some constitutional provision."

The people of Missouri have been no more stringent in writing the Missouri Constitution than the people of New York, Louisiana, and Mississippi have been in writing their constitutions. The long-standing opinions of the highest courts of these three states, dealing with the same issues under similar state constitutional provisions as the instant case presents, constitute strong and persuasive precedent for the conclusion that Senate Bill 638 is not violative of the Missouri Constitution.

Art. IX, sec. 8, Mo.Const., permits of the same construction as the New York Court of Appeals, the Supreme Court of Louisiana, and the Supreme Court of Mississippi, gave to their school-book statutes under constitutional provisions similar to Missouri's and, therefore, adhering to the fundamental principle of construction set forth in Hickey v. Board of Education, *supra,* I believe Senate Bill 638 is not in conflict with Art. IX, sec. 8, Mo.Const.1945, and should be held to be constitutional.

The trial court held that the portion of sec. 170.051, subpar. 4, which requires school boards to provide textbooks to teachers in private schools, to be violative of Art. I, sec. 6, Mo.Const., which provides that no person can be compelled to maintain or support a teacher of any sect, church, creed or denomination of religion, and the principal opinion affirms that portion of the trial court's decree. That affirmance is, of course, understandable as it follows this court's decision on the principal issue in the case—the loaning of secular textbooks to the pupils. However, since I disagree with the decision on the principal issue for the reasons stated supra, I must state that in my opinion the loaning of textbooks to teachers which, under the statute, cannot be used in any form of religious instruction or worship, could not reasonably be considered as maintaining or supporting a teacher of any religion.

Appellants contend that Senate Bill 638 violates Art. IX, sec. 5, Constitution of Missouri, 1945, which prohibits the state public school fund from being used for any purpose other than establishing and maintaining free public schools. The purpose of Art. IX, sec. 5, is to maintain the integrity of the finances of the public schools. It is not directed against religious impaction as such. It has the sole purpose of impeding the use of school funds for non-school purposes, however legitimate.

The public schools derive their support from state and local sources. Under Art. X, sec. 11(c), school districts may adopt and increase public school levies on real and personal property within the district. Art. IX, sec. 3(b) provides that at least 25% of the total state revenues, exclusive of interest and sinking fund payments, must be allocated for public school purposes. Art. III, sec. 36, establishes expenditures for school purposes as the second priority, coming behind only payments of interest and principal on state indebtedness. The funds which school districts obtain by levy, and their mandatory share of

state revenues, may not be used for any purpose not related to the public schools.

Furthermore, any funds in excess of the constitutional minimum which the general assembly provides to school districts for public school purposes may not be used for other purposes.

But the funds available for the purchase of textbooks are not of that sort. They come from proceeds of a particular tax which are subject to the complete control of the legislature. The legislature has made the fund available for one particular purpose—the purchase of textbooks to be loaned to pupils in all schools of the state. The legislature has not made the fund available for general school purposes. The funds never become school funds. McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927 (1953), and related cases do not apply to this situation.

The administration of the funds by school authorities is without significance. Their use of the funds is closely restricted. There is no reason why the legislature may not charge the school officials with additional duties not involving the use of school funds.

Nor does the allocation of proceeds of the foreign insurance premium tax to the purchase of books for public school pupils prior to 1972 alter the situation. The legislature at all times had complete control over the proceeds of the tax. It could have repealed the public school provisions which applied prior to 1972 and allowed the proceeds of the tax to go into general revenue. The public schools did not acquire a vested interest in the tax simply because, prior to 1972, they were the beneficiaries of the proceeds of the same tax.

The validity of the present allocation must be determined without regard to conditions which existed prior to 1972.

In McVey v. Hawkins, *supra,* the expense of transporting pupils to public and nonpublic schools was paid by the school district out of the "incidental fund". The court there stated the issue as being "what use or disposition it (Commerce School District) makes of the state school funds or state aid which it has received and does in fact receive from the State School Moneys Fund, which includes part of the annual income derived from the Public School Fund of the State."

The court held that the incidental fund was part of the State School Moneys Fund and the use of that money for the transportation of nonpublic school children was not "for the support of free public schools" and therefore violated Art. IX, sec. 5, Constitution of Missouri 1945.

In the instant case, Senate Bill 638 specifically provides that the free textbook funds be kept separate from the school district's public school fund monies.

Therefore, the monies made available by the general assembly for free textbooks to all students never became part of the constitutionally protected public school fund and, consequently, the act does not violate the provisions of Art. IX, sec. 5, of the Constitution of Missouri 1945.

For the foregoing reasons I believe that Senate Bill 638 is not violative of the Constitutions of the United States or the State of Missouri and was a lawful exercise of the police power of the State by the general assembly of Missouri and, therefore, I dissent.