Dear Senator Quick and Mr. Reardon:
Each of you has asked for an opinion from this office on certain questions pertaining to the operations of the Clay County Health Center. Because of the similarity of the opinion. Senator Quick's questions are as follows:
 a. Does the Missouri Constitution prohibit a tax-supported county health unit from providing speech therapy services to parochial school students, on parochial school grounds, during normal school hours?
 b. Does the Missouri Constitution prohibit a tax-supported county health unit from providing any health services to parochial school students, whether or not on parochial school grounds?
 c. Are constitutional provisions limiting the ability of public school districts to serve parochial school students applied in a similar way to county health units?
Mr. Reardon's questions are as follows:
 I. Does Article IX, Section 8, of the Missouri Constitution prohibit the use of "public funds" in providing speech services to parochial school students, at the parochial school?
 II. If Article IX, Section 8, of the Missouri Constitution does prohibit the use of "public funds" in providing aid to parochial schools, does this also include all public health services that are offered to the parochial schools?
FACTUAL BACKGROUND
The purpose of a county health center is "for the improvement of health of all inhabitants" of the county. Section 205.050, RSMo 1986. County health centers are established and maintained pursuant to the provisions of Sections 205.010 to 205.150, RSMo. Upon receipt of a petition signed by the prescribed number of voters of the county, the county commission submits to a popular vote the question of whether an annual tax on property in the county should be levied for the establishment and operation of the county health center and its personnel. Section 205.010, RSMo 1986. The county health center is governed by a five-member board of health center trustees elected by popular vote. Sections 205.031,205.041 and 205.042, RSMo 1986. They have exclusive control over the expenditure of all monies credited to the county health center fund. Section 205.042.3, RSMo 1986. The board of health center trustees appoints the personnel for the health center, Section 205.042.4, RSMo 1986, with the director serving also as the county health officer. Section 205.100, RSMo 1986.
We have been provided the following information regarding the Clay County Health Center. The Clay County Health Center renders a variety of health services to children. These services are available to those children who attend public, private non-sectarian and private sectarian schools. All, except one, of the public school districts in the county provide some of these services to their own students through school nurses employed by the school district. The county health center provides these services to the students of the school district which does not provide them on its own.
The services provided by the county health center can be divided into diagnostic, therapeutic and teaching. All are provided by employees or contractors of the county health center. Diagnostic services include dental, vision and scoliosis screenings done on the premises of the school during regular school hours.
Therapeutic services include speech therapy and dental treatment. The speech therapy is provided on school premises during school hours. Those children who are indicated for further dental treatment after the dental screening take a card home to their parents informing them that, if the child is eligible for the free or reduced school lunch program, he can receive free dental treatment at the county health center facilities during regular business hours.
The teaching services consist of lectures given by such people as the county health center dental hygienist, nutritionist or health educator to children on school premises during school hours in a classroom setting. These are presentations on topics of general health and safety and are normally completed in one session. They are given upon the request of the school.
LEGAL DISCUSSION
1. PUBLIC HEALTH SERVICES
The following provisions of the Missouri Constitution are those most directly implicated:
Article I, Section 6, Missouri Constitution:
 "That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same."
Article I, Section 7, Missouri Constitution:
 "That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship."
Article IX, Section 8, Missouri Constitution:
 "Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any county, city, town, or other municipal corporation, for any religious creed, church, or sectarian purpose whatever."
In a decision regarding the constitutionality of certain provisions of Sections 170.051 and 170.055, RSMo 1969, which provided for the lending of textbooks purchased with public funds to pupils and teachers in nonpublic schools, the Missouri Supreme Court made the following observation:
 "From all of which, it becomes readily apparent that the provisions of the Missouri Constitution declaring that there shall be a separation of church and state are not only more explicit but more restrictive than the Establishment Clause of the United States Constitution." Paster v. Tussey, 512 S.W.2d 97, 101-102 (Mo. banc 1974), cert. denied sub nom. Reynolds v. Paster, 419 U.S. 1111 (1975).
The court went on to hold that the contested provisions of those statutes violated both Article I, Section 6 and ArticleIX, Section 8 of the Missouri Constitution on the basis that to give assistance to a student attending a sectarian school which would aid that student in the objective of obtaining a sectarian education serves to give unconstitutional aid to a sectarian purpose. Id. at 104-105.
Sections 205.010 to 205.150, RSMo, establishing county health centers were passed in furtherance of the health and welfare of the public and, as such, represent an exercise of the police power of the state. However, the police power, as with any other governmental power, must always be exercised within the constraints of constitutional authority. DePass v. B.Harris Wool Co., 346 Mo. 1038, 144 S.W.2d 146, 148 (banc 1940), and State ex rel. Preisler v. Woodward, 340 Mo. 906,105 S.W.2d 912, 915 (1937).
There has been no reported case in which any court has addressed the question as to what extent Article I, Sections 6 and 7 and Article IX, Section 8 of the Missouri Constitution limit the state and local government's police powers in regard to providing health and welfare services to children attending sectarian schools. Other jurisdictions, interpreting their respective state constitutional restrictions, have recognized that such provisions do not impose a blanket prohibition on providing health and welfare services to those children.
In Spears v. Honda, 449 P.2d 130 (Hawaii 1968), the Hawaii Supreme Court ruled that a statute providing public funds for bus transportation subsidies to sectarian and other private schools ran afoul of Article IX, Section 1, of the Hawaii Constitution providing that no public funds shall be "appropriated for the support or benefit of any sectarian or private educational institution." The court interpreted this provision as prohibiting indirect as well as direct benefits.Id. at 137. However, the court cited the report of the committee in the constitutional convention which drafted that particular constitutional provision as expressly not intending to "prohibit the present practice of the use of public money for dental and public health services in private schools in the Territory." Id. at 135. The court went on to hold:
 "While the framers specifically excepted the existing practice of the use of public money for dental and public health services in private schools from the prohibition, the funds appropriated for such services were viewed not as a benefit to children but as funds to be used by the State to exercise `nominal supervisory control' over nonpublic schools `in the interests of the public health.' The services were aimed at assuring that the nonpublic schools, as centers of learning, were as safe to attend as the public schools. Appellees admit that, even today, the children are inspected at the school itself during school hours." Id. at 135-136.
In Dickman v. School District No. 62C, Oregon City, ofClackamas County, 366 P.2d 533 (Ore. banc 1961), cert. deniedsub nom. Carlson v. Dickman, 371 U.S. 823 (1962), the Oregon Supreme Court declared a free textbook statute violative of Article I, Section 5, of the Oregon Constitution:
 "No money shall be drawn from the Treasury for the benefit of any religeous [sic], or theological institution, nor shall any money be appropriated for the payment of any religeous [sic] services in either house of the Legislative Assembly."
The court held that this provision expressed the policy of the First Amendment of the United States Constitution as explained in Everson v. Board of Education, 330 U.S. 1,67 S.Ct. 504, 91 L.Ed. 711 (1946). It did not regard "as significant the fact that our constitution does not contain the phrase `directly or indirectly' as some constitutions do."Id. at 543, fn. 31. The court held that the free textbook statute was unconstitutional for the same reasons as the Missouri Supreme Court did in Paster v. Tussey, supra. Even though it rejected the authority of the police power of the state as the basis on which the free textbook statute could be upheld, the court still recognized the validity of providing health and welfare services to parochial school students:
 "Neither the federal nor the state constitutions prohibit the state from conferring benefits upon religious institutions where that benefit does not accrue to the institution as a religious organization. The proscription is against aid to religious functions. The benefits of police and fire protection, sewage disposal, and other community financed services accrue to churches, not as religious organizations but as owners of property in the community. And, the same principle applies when public expenditures benefit individuals who are engaged in carrying out a religious function. A government pension paid to a clergyman for his services in the Armed Forces may benefit religion but it is not constitutionally prohibited; in such case he receives the bounty not as a cleric but as any other citizen. On the other hand, the state obviously could not pay the clergyman's salary. The point is clearly seen by Cushman, Public Support of Religious Education in American Constitutional Law, 45 Ill.L.Rev. 333, 348 (1950):
 `The difference between providing police protection and providing teachers does not lie in the identity of the beneficiary but in the way in which the aid is extended. Aid is not normally extended to individuals or institutions by name, but rather to groups or classes of individuals or institutions. Any individual or institution falling under the restrictions of the law, or falling heir to its benefits, does so only as a member of such a group. An individual may be a pupil, a pedestrian, a property owner and a parent. A church is at once a corporation, a piece of property, a building, a meeting place, a religious institution and a nonprofit institution. Furthermore, a church may receive police protection when classed as property, tax exemption when classed as a non-profit institution, sewage connections when classed as a building, and yet be denied financial aid when classed as a religious institution, since such a class may not validly be given public aid. Since the aid goes to groups rather than the individual components of any one group, the eligibility of an institution to receive public aid would seem to depend on which group it is classed in, rather than on its individual characteristics.'
 The author then correctly concludes that where the aid is to pupils and schools the benefit is identified with the function of education and if the educational institution is religious, the benefit accrues to religious institutions in their function as religious institutions. And so it is in the case at bar. Granting that pupils and not schools are intended to be the beneficiaries of the state's bounty, the aid [free textbooks] is extended to the pupils only as a member of the school which he attends. Whoever else may share in its benefits such aid is an asset to the schools themselves. State ex rel. Traub v. Brown, 36 Del. 181, 172 A. 835 (1934)." Id. 542-543.
We, therefore, conclude that Article I, Sections 6 and 7 and Article IX, Section 8 of the Missouri Constitution do not contain a complete prohibition on public funds being used to provide health and welfare services to children who attend sectarian schools. Considering the second of each of your questions first, the county health center makes the diagnostic services referred to in those questions available to public and private schools, including both sectarian and non-sectarian private schools. It is clear that the class or group targeted is not described by the school attended but by the age of the person. It makes sense that, when targeting a particular population group for general health and welfare services, health center personnel would go to the place where members of that group are in the greatest abundance. In this case, school age children being the intended recipient of the services, the health center personnel go to schools during the school day. Simply because the children happen to be in a sectarian school does not mean that the health center is prohibited from providing them certain types of services at that school. Therefore, we conclude that providing the diagnostic health services to students in sectarian schools during the regular school day and on that school's premises does not violate Article I, Sections 6 and 7 nor Article IX, Section 8 of the Missouri Constitution. The same conclusion applies to providing dental treatment to eligible students of all schools, including those from sectarian schools, which treatment is provided at the health center facilities and not on school grounds.
2. SPEECH THERAPY AND TEACHING
In regard to rendering speech therapy services and teaching public health classes to sectarian school students during the regular school day at a sectarian school, there is no need to analyze the legality of these activities under the state constitutional provisions cited above because they are prohibited by the Establishment Clause of the First Amendment to the United States Constitution which is applicable to the states through the Fourteenth Amendment. Meek v. Pittenger,421 U.S. 349, 351, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975):
 "Congress shall make no law respecting an establishment of religion, . . ." U.S. Const., Amend. I.
The First Amendment issues regarding the types of services with which we are concerned here were resolved in Meek v.Pittenger, supra, and Wolman v. Walter, 433 U.S. 229,97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). In Meek, the court addressed the constitutionality of Acts 194 and 195, Pa.Stat.Ann., Tit. 24, Section 9-972, enacted by the Commonwealth of Pennsylvania. Act 194 provided for certain "auxiliary services" to be rendered through the expenditures of public funds. These auxiliary services included:
 "guidance, counseling and testing services; psychological services; services for exceptional children; remedial and therapeutic services; speech and hearing services; services for the improvement of the educationally disadvantaged (such as, but not limited to, teaching English as a second language), and such other secular, neutral, non-ideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth."
The Act also provided that these services would be rendered on the premises of nonpublic schools by public school personnel and only when requested by nonpublic school representatives.
The constitutional test under the establishment clause is as follows:
 "First, the statute must have a secular legislative purpose . . . . Second, it must have a `primary effect' that neither advances nor inhibits religion . . . . Third, the statute and its administration must avoid excessive government entanglement with religion. . . ." [citations omitted] Meek v. Pittenger, supra,
421 U.S. at 358.
The court held that the provision of remedial educational services and guidance counseling violated that test:
 "Whether the subject is `remedial reading,' `advanced reading,' or simply `reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists. The likelihood of inadvertent fostering of religion may be less in a remedial arithmetic class than in a medieval history seminar, but a diminished probability of impermissible conduct is not sufficient: `The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion.' 403 U.S., at 619. And a state-subsidized guidance counselor is surely as likely as a state-subsidized chemistry teacher to fail on occasion to separate religious instruction and the advancement of religious beliefs from his secular educational responsibilities.[21] . . . . The potential for impermissible fostering of religion under these circumstances, although somewhat reduced, is nonetheless present. To be certain that auxiliary teachers remain religiously neutral, as the Constitution demands, the State would have to impose limitations on the activities of auxiliary personnel and then engage in some form of continuing surveillance to ensure that those restrictions were being followed." [footnote omitted]. Id.,
421 U.S. at 370-372.
In footnote 21, the court excepted the provision of diagnostic services from this constitutional infirmity:
 "21. The `speech and hearing services' authorized by Act 194, at least to the extent such services are diagnostic, seem to fall within that class of general welfare services for children that may be provided by the State regardless of the incidental benefit that accrues to church-related schools. . . ."
Subsequent to the Meek decision, Ohio passed legislation which attempted to provide certain services to nonpublic school children in a manner conforming to the teachings in Meek. In Ohio Rev. Code Ann. Section 3317.06 (Supp. 1976), the state among other things, allowed the expenditure of public funds:
 "(D) To provide speech and hearing diagnostic services to pupils attending nonpublic schools within the district. Such service shall be provided in the nonpublic school attended by the pupil receiving the service.
* * *
 (F) To provide diagnostic psychological services to pupils attending nonpublic schools within the district. Such services shall be provided in the school attended by the pupil receiving the service."
It was also provided that no school district would render health or remedial services to nonpublic school pupils unless such services were made available to pupils attending the public schools within the district. The personnel providing the services were employees of the local board of education or physicians hired on a contractual basis with the purpose of the services being to determine the pupil's deficiency or need of assistance. The treatment of any defect took place off the premises of the nonpublic school.
The United States Supreme Court upheld the constitutionality of the statute:
 "This Court's decisions contain a common thread to the effect that the provision of health services to all school children — public and nonpublic — does not have the primary effect of aiding religion. . . . . Indeed, appellants recognize this fact in not challenging subsection (E) of the statute that authorizes publicly funded physician, nursing, dental, and optometric services in nonpublic schools. We perceive no basis for drawing a different conclusion with respect to diagnostic speech and hearing services and diagnostic psychological services." [footnote omitted]. Wolman v. Walter, supra,
433 U.S. at 242.
The court considered the diagnostic services to be different from teaching or counseling services because diagnostic services have little or no educational content and are not closely associated with the educational mission of the nonpublic school. Furthermore, the diagnostician has only limited contact with the child which involves the use of objective and professional testing methods to detect students in need of treatment. Id., 433 U.S. at 244.
 "We conclude that providing diagnostic services on the nonpublic school premises will not create an impermissible risk of the fostering of ideological views. It follows that there is no need for excessive surveillance, and there will not be impermissible entanglement. We therefore hold that Sections 3317.06(D) and (F) are constitutional." Id.
The rendering of therapeutic services was also taken up in the Wolman decision. The statute provided for various services including therapeutic psychological, speech, hearing, guidance and counseling services, to be provided to nonpublic school students but in public schools, public centers or mobile units located off of the nonpublic premises as determined by the state. Again, the services were required to be at least equal to those provided for students in public schools.
The court held:
 ". . . that providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion. Neither will there be any excessive entanglement arising from supervision of public employees to insure that they maintain a neutral stance. It can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state." Id. 433 U.S. at 248.
The court was careful to note, however, that the programs are not intended to influence the classroom activities in the nonpublic schools. It would be constitutionally improper for counseling or remedial teachers to get involved in curriculum planning and selection except for long-term, broad scale planning of career choices and in general areas of study. Id.433 U.S. at 246, fn. 13.
Applying the Supreme Court's standards as explained in these opinions, we conclude that the provision by public employees at public expense of speech therapy or public health lectures on general health and safety topics to pupils of sectarian schools on the premises of such a school violates the Establishment Clause of the First Amendment for the reasons stated in those opinions. See also, Stark v. St. Cloud StateUniversity, 802 F.2d 1046, 1050-1052 (8th Cir. 1986) for discussion of state-sponsored teaching in sectarian schools creating an impermissible perception in students' minds that the state supports the sectarian school and its religious message.
It should be made clear, however, that the provision of emergency medical services, such as in the case of accident or illness, on school grounds, is not prohibited.[1] Also, in regard to teaching on public health matters, we do not conclude that such teaching is prohibited in all circumstances. For instance, the provision of strictly public health information on sectarian school premises regarding matters of an urgent nature, such as in the case of teaching preventative measures during disease epidemics, would not be prohibited by either federal or state constitutions.
3. APPLICABLE STATE CONSTITUTIONAL PROVISIONS
In Senator Quick's third question, he asks whether the constitutional provisions limiting the ability of public school districts to serve parochial school students apply in a similar way to county health centers.
The following constitutional provisions which have been quoted previously in this opinion have been held to limit public school districts: Article I, Sections 6 and 7, and Article IX, Section 8, of the Missouri Constitution. McVey v. Hawkins,258 S.W.2d 927 (Mo. banc 1953) and Paster v. Tussey, supra.
These constitutional provisions are also applicable to county health centers since those centers expend funds which are "public funds" and which are in the "public treasury". Stateex rel. St. Louis Police Relief Association v. Igoe,340 Mo. 1166, 107 S.W.2d 929, 933 (1937).
In addition to the above constitutional provisions, ArticleIX, Section 5, Missouri Constitution, has also been held to limit school districts. McVey v. Hawkins, supra, andSpecial District for Education and Training of HandicappedChildren of St. Louis County v. Wheeler, 408 S.W.2d 60 (Mo. banc 1966). That section provides:
 "The proceeds of all certificates of indebtedness due the state school fund, and all moneys, bonds, lands, and other property belonging to or donated to any state fund for public school purposes, and the net proceeds of all sales of lands and other property and effects that may accrue to the state by escheat, shall be paid into the state treasury, and securely invested under the supervision of the state board of education, and sacredly preserved as a public school fund the annual income of which shall be faithfully appropriated for establishing and maintaining free public schools, and for no other uses or purposes whatsoever."
This provision is not applicable to county health centers since by its very terms it is concerned only with limiting state money preserved as "a public school fund" for the purpose of "establishing and maintaining free public schools". The county health centers do not expend money from any such fund. Sections205.020 and 205.042.3, RSMo 1986.
CONCLUSION
It is the opinion of this office that:
 1. The Establishment Clause of the First Amendment of the United States Constitution, as applicable to this state through the Fourteenth Amendment, prohibits county health centers from providing speech therapy services and certain public health lectures to the students of sectarian schools on the premises of those schools during normal school hours.
 2. Neither the Establishment Clause of the First Amendment of the United States Constitution, nor Article I, Sections 6 and 7, nor Article IX, Section 8, of the Missouri Constitution prohibit county health centers from providing diagnostic and screening health services to the students of sectarian schools, whether or not on the grounds of those schools.
Very truly yours,
 WILLIAM L. WEBSTER Attorney General
[1] Subsequent to and relying upon Wolman v. Walter, supra, a federal district court upheld, under the Establishment Clause, a New York law which provided for students within parochial schools to get physician, nursing and dental services, diagnostic psychological and speech services, and dental prophylaxis, medical history, health screening and maintenance of cumulative health record services, vision and hearing tests and emergency services performed on parochial school grounds. The statute also provided for therapeutic and remedial services to be rendered in a "religiously neutral location". Filler v.Port Washington Union Free School District, 436 F. Supp. 1231,1239 (E.D. N.Y. 1977).