SUPREME COURT OF MISSOURI
 en banc

JOHN DOE 122, ) Opinion issued April 6, 2021
 )
 Appellant, )
 )
v. ) No. SC98307
 )
MARIANIST PROVINCE OF THE )
UNITED STATES AND CHAMINADE )
COLLEGE PREPARATORY, INC., )
 )
 Respondents, )
 )
AND )
 )
FR. MARTIN SOLMA, )
 Defendant. )

 APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
 The Honorable Kristine Allen Kerr, Judge

 This is an appeal from a grant of summary judgment in favor of the Marianist

Province of the United States (“the Marianist Province”) and Chaminade College

Preparatory, Inc. (“the High School” and, together with the Marianist Province,

“Chaminade”). 1 John Doe 122 (“Doe”) filed suit against Chaminade, alleging he

1
 Father Martin Solma (“Father Solma”), the Marianist Provincial in 2015, was also named as a
defendant, but he was dismissed in October 2018.
suffered sexual abuse while he was a student at the High School in the early 1970s. The

issues on appeal are whether Gibson v. Brewer, 952 S.W.2d 239 (Mo. banc 1997), bars

Doe’s negligence-based claims and whether, given Chaminade’s statement of material

facts and the deposition testimony of Doe’s expert, summary judgment was proper on

Doe’s claims of intentional failure to supervise. This Court has jurisdiction pursuant to

article V, section 10 of the Missouri Constitution. The judgment is affirmed in part and

vacated in part, and the case is remanded for further proceedings.

 Background

 The following facts are taken from Doe’s allegations. He was born in 1953 and

graduated from the High School as a senior in 1971. Doe was sexually abused by

Brother John Woulfe (“Brother Woulfe”), 2 a Marianist brother who was Doe’s counselor.

Doe met with Brother Woulfe approximately eight to ten times during his senior year.

Brother Woulfe provided Playboy magazines and cigarettes to Doe. Brother Woulfe later

encouraged Doe to masturbate while looking at the magazines, sometimes while Brother

Woulfe also masturbated. Brother Woulfe touched Doe’s penis and, in the last encounter,

put his mouth on Doe’s penis.

 After graduation, Doe attempted to put the abuse behind him and moved to

Arizona. He had no further memories of the abuse after 1973. In 2012, Doe received a

letter from Father Solma indicating Chaminade had received an allegation of sexual

abuse against Brother Woulfe. This letter brought back his memories of abuse.

2
 Brother Woulfe died prior to Doe filing suit.

 2
 In November 2015, Doe filed suit against Chaminade, alleging sexual abuse and

battery in Count I, negligent supervision in Count II, intentional failure to supervise

clergy in Count III, negligent failure to supervise children in Count IV, intentional

infliction of emotional distress in Count V, and breach of fiduciary duty in Count VI.

After a period of discovery, Chaminade moved for summary judgment, arguing the

statute of limitations barred all of Doe’s claims, Gibson barred Doe’s negligence-based

claims, and Doe’s intentional failure to supervise claim failed because Doe admitted he

had no direct proof that Chaminade knew Brother Woulfe was abusing students at the

High School before Brother Woulfe allegedly abused Doe. Doe opposed the motion and

filed a statement of additional facts with supporting exhibits.

 In March 2019, the circuit court sustained Chaminade’s motion for summary

judgment on all counts, determining, inter alia, that Gibson barred Doe’s negligence-

based claims and that Doe’s intentional failure to supervise clergy claim was not

supported by sufficient competent evidence that Chaminade knew of Brother Woulfe’s

history of abuse. 3 Doe appealed to the court of appeals, which transferred the case to this

Court pursuant to Rule 83.02.

3
 The circuit court declined to consider Chaminade’s statute of limitations argument, stating that
because all of Doe’s claims were disposed on other grounds, it was unnecessary to grasp “the
thorny factual thistles” regarding whether Doe’s suit was filed within the applicable statute of
limitations. Because this Court holds it was error to grant Chaminade summary judgment on
Doe’s intentional failure to supervise claim, Chaminade’s statute of limitations defenses will
need to be resolved on remand.

 3
 Analysis

 The propriety of summary judgment is an issue of law, and this Court’s review of

a grant of summary judgment is essentially de novo. ITT Commercial Fin. Corp. v. Mid-

Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). The Court “review[s]

the record in the light most favorable to the party against whom judgment was entered.”

Id. Summary judgment is proper only if the moving party establishes there is no genuine

issue of material fact and the movant is entitled to judgment as a matter of law. Id. at

382. See also Rule 74.04. A genuine issue exists when the record contains competent

materials that evidence two plausible, but contradictory, accounts of the essential facts.

ITT Commercial Fin. Corp., 854 S.W.2d at 382. A genuine issue is a dispute that is real,

not merely argumentative, imaginary, or frivolous. Id. The Court accords the

non-movant the benefit of all reasonable inferences from the record. Id.

 I.

 Doe contends the circuit court erred in dismissing his negligence-based claims

(Counts II and IV) because Gibson was wrongly decided. Doe claims that the First

Amendment does not bar generally applicable tort rules that apply to all employers,

including the duty to use reasonable care in supervising employees who work with

children in order to prevent sexual abuse.

 In Gibson, a boy and his parents asserted multiple claims against a Catholic priest

and diocese. Gibson, 952 S.W.2d at 243. They alleged the priest invited the boy to

spend the night and watch movies in the church rectory and that, early in the morning, the

priest touched the boy in a sexual, offensive, and unwelcome manner. Id. They asserted

 4
nine counts, including three claims against the diocese, i.e., negligent hiring or retention,

negligent failure to supervise, and intentional failure to supervise clergy. See id. at 243-

44, 248. The circuit court dismissed all the counts against the diocese. Id. at 244.

 Regarding the plaintiff’s claim of negligent hiring or retention, this Court

concluded:

 Negligence is conduct which falls below the standard established by law for
 the protection of others against unreasonable risk of harm. To establish a
 claim for negligent hiring or retention, a plaintiff must show: (1) the
 employer knew or should have known of the employee’s dangerous
 proclivities, and (2) the employer’s negligence was the proximate cause of
 the plaintiff’s injuries.

 Religious organizations are not immune from civil liability for the acts of
 their clergy. If neutral principles of law can be applied without determining
 questions of religious doctrine, polity, and practice, then a court may
 impose liability. For example, a church can be vicariously liable for the
 negligent operation of a vehicle by a pastor in the scope of employment.
 This Court—when abolishing the doctrine of charitable immunity in
 Missouri—authorized a person who slipped and fell on church premises to
 sue for negligence. The result is that the church, as the owner and occupier
 of the premises in question, is subject to all the duties and liabilities which
 are incident to the ownership and possession of real estate.

 Questions of hiring, ordaining, and retaining clergy, however, necessarily
 involve interpretation of religious doctrine, policy, and administration.
 Such excessive entanglement between church and state has the effect of
 inhibiting religion, in violation of the First Amendment.

 By the same token, judicial inquiry into hiring, ordaining, and retaining
 clergy would result in an endorsement of religion, by approving one model
 for church hiring, ordination, and retention of clergy. A church’s freedom
 to select clergy is protected as a part of the free exercise of religion against
 state interference. Ordination of a priest is a quintessentially religious
 matter, whose resolution the First Amendment commits exclusively to the
 highest ecclesiastical tribunals of this hierarchical church. The trial court
 did not err in dismissing the claims of negligent hiring/ordination/retention.

 5
Id. at 246-47 (quotation marks and citations omitted). Regarding the claim of negligent

failure to supervise clergy, this Court concluded:

 Negligent supervision implicates the duty of a master to control conduct of
 a servant:

 A master is under the duty to exercise reasonable care so to
 control his servant while acting outside the scope of his
 employment as to prevent him from intentionally harming
 others or from so conducting himself as to create an
 unreasonable risk of bodily harm to them if

 (a) the servant

 (i) is upon the premises in possession of the
 master or upon which the servant is privileged
 to enter only as his servant, or

 (ii) is using a chattel of the master, and

 (b) the master

 (i) knows or has reason to know that he has
 the ability to control his servant, and

 (ii) knows or should know of the necessity and
 opportunity for exercising such control.

 Adjudicating the reasonableness of a church’s supervision of a cleric––
 what the church “should know”––requires inquiry into religious doctrine ....
 [T]his would create an excessive entanglement, inhibit religion, and result
 in the endorsement of one model of supervision.

 Not recognizing the cause of negligent failure to supervise clergy is not an
 establishment of religion because it is a nondiscriminatory religious-
 practice exemption. It achieves a benevolent neutrality which will permit
 religious exercise to exist without sponsorship and without interference.
 Nonrecognition of this negligence tort preserves the autonomy and freedom
 of religious bodies while avoiding any semblance of established religion.

Id. at 247-48 (quotation marks and citations omitted).

 6
 Doe contends Gibson was wrongly decided because it misread the relevant United

States Supreme Court’s First Amendment precedent at that time. Doe argues that, even

though high court decisions from other states are not binding on this Court, the sheer

volume of decisions 4 that were handed down after Gibson and that rejected its

conclusions demonstrates Gibson was wrongly decided and should now be overruled. 5

 The First Amendment, made applicable to the states through the Fourteenth

Amendment, provides in part, “Congress shall make no law respecting an establishment

of religion, or prohibiting the free exercise thereof ....” In Employment Division,

Department of Human Services of Oregon v. Smith, the Supreme Court held the

application of neutral legal principles to religious actors and organizations did not violate

4
 This voluminous list of cases is provided at Appellant’s Brief at 34-35 n.3 and, notably,
includes Turner v. Roman Catholic Diocese of Burlington, Vt., 987 A.2d 960 (Vt. 2009) (holding
negligence claim does not violate First Amendment because the standard of care is measured by
secular legal standards, not canon law); Roman Catholic Diocese of Jackson v. Morrison, 905
So. 2d 1213 (Miss. 2005) (en banc) (expressly rejecting Gibson and holding Free Exercise and
Establishment clauses do not bar negligence-based claims against clergy); Malicki v. Doe, 814
So. 2d 347 (Fla. 2002) (same); C.J.C. v. Corp. of Catholic Bishop of Yakima, 985 P.2d 262
(Wash. 1999) (en banc) (holding neither the First Amendment nor corresponding provision of the
Washington Constitution prevented the imposition of the duty of reasonable care to prevent
foreseeable harm to children by clergy); and Bear Valley Church of Christ v. Debose, 928 P.2d
1315 (Colo. 1996) (en banc) (holding Free Exercise Clause does not bar negligence-based claims
against clergy when the claims did not involve disputes based on ecclesiastical or disciplinary
matters).
5
 As was the case in Gibson, Doe has not argued under, or even cited to, the Missouri
Constitution’s religion clauses set forth in article I, sections 5-7. As the Court stated in Gibson:
 This Court has held “that the provisions of the Missouri Constitution declaring
 that there shall be a separation of church and state are not only more explicit but
 more restrictive” than the First Amendment. Paster v. Tussey, 512 S.W.2d 97,
 101-02 (Mo. banc 1974). Therefore, this Court does not address the applicability,
 if any, of the Missouri Constitution to this case.
Gibson, 952 S.W.2d at 246.

 7
the First Amendment’s Free Exercise Clause. 494 U.S. 872 (1990). The Supreme Court

concluded, “[T]he First Amendment ... excludes all governmental regulation of religious

beliefs as such,” id. at 877 (quotation marks omitted), but “the right of free exercise does

not relieve an individual of the obligation to comply with a valid and neutral law of

general applicability on the ground that the law proscribes (or prescribes) conduct that his

religion prescribes (or proscribes),” id. at 879 (quotation marks omitted). Smith built on

the Supreme Court’s long-existing analytical framework under the Free Exercise Clause

under which the government may prohibit conduct but may not attempt to interfere with

religious belief. See Reynolds v. United States, 98 U.S. 145, 161-67 (1878) (upholding

federal law banning polygamy in Utah Territory as “constitutional and valid as

prescribing a rule of action for all those residing in the Territories”). Additionally, under

the Establishment Clause, the government may not sponsor a religion or become

excessively entangled with religion. See Lemon v. Kurtzman, 403 U.S. 602, 612-13

(1971).

 Doe argues the duty to use reasonable care to supervise employees working with

children in order to prevent sexual abuse is a neutral principle of law that regulates

conduct, not beliefs. Accordingly, he insists, it does not violate the Free Exercise Clause.

Doe further argues these same neutral principles do not sponsor or result in excessive

entanglement with any particular religion, which would violate the Establishment Clause.

Instead, Doe contends Gibson created a privileged class of religious employers and,

therefore, it is Gibson and not the application of negligence claims to religious

institutions that constitutes a violation of the Establishment Clause.

 8
 Doe’s arguments are not without some persuasive force, as indicated by the weight

of precedents from other states reaching the conclusion for which he advocates. Were

this Court writing on a blank slate in this case, it is possible the result would be different

from the one reached in Gibson. But the Court is not writing on a blank slate. Instead,

this Court is bound by its own decisions and, on this issue, those of the United States

Supreme Court. With respect to the latter, the few relevant decisions from the Supreme

Court that have been handed down since Gibson do not expressly or implicitly reject the

reasoning or conclusion in Gibson, nor do they clearly counsel a contrary result.

 Instead, to the extent they shed any light on the subject at all, these decisions seem

consistent with the conclusion reached in Gibson that “[q]uestions of hiring, ordaining,

and retaining clergy ... necessarily involve interpretation of religious doctrine, policy, and

administration[,]” and, therefore, the First Amendment prohibits the state from regulating

those decisions even in the guise of applying facially neutral tort principles. Gibson, 952

S.W.2d at 246-47. Gibson quotes the Supreme Court’s decision in Kedroff v.

St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94 (1952), for the

proposition that “[a] church’s freedom to select clergy is protected ‘as a part of the free

exercise of religion against state interference.’” Id. at 247 (quoting Kedroff, 344 U.S. at

116). Contrary to Doe’s argument and the state high court decisions Doe marshals in

support, see supra note 3, this is the view of the First Amendment the Supreme Court

seems to have taken since Gibson was decided. Most recently, in the employment

context, the Supreme Court has made clear “that it is impermissible for the government to

contradict a church’s determination of who can act as its ministers.” Hosanna-Tabor

 9
Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 185 (2012). The Supreme

Court further stated:

 Requiring a church to accept or retain an unwanted minister, or punishing a
 church for failing to do so, intrudes upon more than a mere employment
 decision. Such action interferes with the internal governance of the church,
 depriving the church of control over the selection of those who will
 personify its beliefs. By imposing an unwanted minister, the state infringes
 the Free Exercise Clause, which protects a religious group’s right to shape
 its own faith and mission through its appointments. According the state the
 power to determine which individuals will minister to the faithful also
 violates the Establishment Clause, which prohibits government
 involvement in such ecclesiastical decisions.

Id. at 188-89.6 This reasoning squares with this Court’s decision in Gibson.7 With no

clearly discernible change in direction on this issue from the Supreme Court following

Gibson, this Court is bound by that case and its reading of the relevant Supreme Court

cases up to that time. To overrule Gibson now, simply because it might have been

decided differently – or because decisions from other state courts have decided similar

6
 Further, in Hosanna-Tabor, the Supreme Court distinguished Smith by concluding,
“Smith involved government regulation of only outward physical acts. The present case, in
contrast, concerns government interference with an internal church decision that affects the faith
and mission of the church itself.” Hosanna-Tabor, 565 U.S. at 190.
7
 In Our Lady of Guadalupe School v. Morissey-Berru, 140 S. Ct. 2049 (2020), the Supreme
Court strongly followed and even expanded Hosanna-Tabor, without referring to the principle of
neutral laws of general applicability exemplified in Smith. See id. at 2060 (“The independence
of religious institutions in matters of ‘faith and doctrine’ is closely linked to independence in
what we have termed ‘matters of church government.’ [Hosanna-Tabor,] 565 U. S. at 186, 132
S. Ct. 694. This does not mean that religious institutions enjoy a general immunity from secular
laws, but it does protect their autonomy with respect to internal management decisions that are
essential to the institution’s central mission.”). Contra id. at 2072 (Sotomayor, J., dissenting)
(citing Smith and characterizing the Americans with Disabilities Act and Title VII as generally
applicable laws).

 10
cases differently – reduces the principles of stare decisis to a doctrine of mere

convenience. 8

 Moreover, Gibson does not grant immunity to religious organizations as Doe

contends. Instead, Gibson makes clear that “[r]eligious organizations are not immune

from civil liability for the acts of their clergy.” Gibson, 952 S.W.2d at 246. Gibson

carefully explained that the First Amendment protects religious organizations from

claims for damages based on negligence (which require an impermissible examination of

ecclesiastical decisions), but not claims based on intentional conduct (which require no

such impermissible examination). See infra Part II. See also Gibson, 952 S.W.2d at 248

(recognizing the claim of intentional failure to supervise clergy). And, of course, the

individual accused of abuse is subject to civil or criminal liability for such acts.

 Accordingly, the circuit court did not err in granting Chaminade summary

judgment on Counts II and IV as required by Gibson. Doe’s first point is denied.

8
 “Under the doctrine of stare decisis, a decision of this court should not be lightly overruled,
particularly where, as here, the opinion has remained unchanged for many years.” S.W. Bell
Yellow Pages, Inc. v. Dir. of Revenue, 94 S.W.3d 388, 390 (Mo. banc 2002) (quotation marks
omitted). “In those instances, however, where it appears that an opinion is clearly erroneous and
manifestly wrong ... stare decisis is never applied to prevent the repudiation of such a decision.”
Id. at 390-91. But when this Court decides issues involving the United States Constitution (on
which the United States Supreme Court has the last word), this Court should not depart from that
decision simply because it disagrees with it unless there is a basis in the intervening decisions of
the Supreme Court indicating the decision of this Court was clearly erroneous or manifestly
wrong.

 11
 II.

 Even though Doe’s negligence-based claims fail, he also asserts a claim of

intentional failure to supervise in Count III, which Gibson holds is not barred by the First

Amendment. Gibson provides:

 A cause of action for intentional failure to supervise clergy is stated if (1) a
 supervisor (or supervisors) exists (2) the supervisor (or supervisors) knew
 that harm was certain or substantially certain to result, (3) the supervisor (or
 supervisors) disregarded this known risk, (4) the supervisor’s inaction
 caused damage, and (5) the other requirements of the Restatement (Second)
 of Torts, section 317 are met.[ 9] This cause of action requires a supervisor.
 The First Amendment does not, however, allow a court to decide issues of
 church government––whether or not a cleric should have a supervisor.

Gibson, 952 S.W.2d at 248.

 Doe asserts two claims that the circuit court erred in dismissing Count III

regarding intentional failure to supervise clergy. In Point III, Doe claims it was error to

grant Chaminade summary judgment on this count because the testimony of Doe’s expert

witness, Father Thomas Doyle (“Father Doyle”), created a genuine issue of material fact

9
 Section 317 of the Restatement (Second) of Torts provides:
 A master is under a duty to exercise reasonable care so to control his servant
 while acting outside the scope of his employment as to prevent him from
 intentionally harming others or from so conducting himself as to create an
 unreasonable risk of bodily harm to them, if
 (a) the servant
 (i) is upon the premises in possession of the master or upon which
 the servant is privileged to enter only as his servant, or
 (ii) is using a chattel of the master, and
 (b) the master
 (i) knows or has reason to know that he has the ability to control
 his servant, and
 (ii) knows or should know of the necessity and opportunity for
 exercising such control.

 12
as to the disputed elements of the intentional failure to supervise tort. This point has

merit. 10

 The elements of intentional failure to supervise at issue here are whether the

supervisor (or supervisors) knew 11 that harm was certain or substantially certain to result

and whether the supervisor (or supervisors) disregarded that known risk. Doe alleges

Brother Woulfe sexually abused him in 1971 while Doe was a high-school senior at

Chaminade. The undisputed evidence is that Brother Woulfe ultimately was removed

from Chaminade in 1977 because of allegations of sexual abuse. The key issue,

therefore, is whether Chaminade knew – prior to Doe’s abuse in 1971 – that Brother

Woulfe posed a risk of abuse such that harm to the children in its care was certain or

substantially certain to occur and disregarded that known risk. “Direct proof of the

required mental state is seldom available, and such intent is usually inferred from

circumstantial evidence.” State v. Letica, 356 S.W.3d 157, 166 (Mo. banc 2011). This is

so in civil cases as well. See Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 20 (Mo.

banc 1995) (“Intent in nearly every case is proven by circumstantial evidence, and failure

to provide direct evidence of such intent is an improper basis for summary judgment.”).

10
 Because Doe’s Point III is dispositive, the Court does not address Doe’s alternative argument
that Chaminade failed to support its motion for summary judgment with sufficient material and
undisputed facts.
11
 The quoted portion of Gibson speaks in terms of what the supervisor “knew.” Gibson, 952
S.W.2d at 248. Section 317 of the Restatement, however, which Gibson expressly adopts,
speaks in terms of what the supervisor knows or should know. In this case, however, the Court
need not address the difference – if any – between these two parts of Gibson because summary
judgment should have been denied on the ground that there was sufficient evidence to submit to
a jury the question of whether Chaminade knew of Brother Woulfe’s prior sexual abuse and
disregarded that known risk.

 13
 Here, the jury will – if Chaminade’s summary judgment motion on statute of

limitations grounds is overruled – consider whether to infer from the evidence, including

Brother Woulfe’s personnel records, 12 that Chaminade knew Brother Woulfe posed such

a risk and disregarded that known risk. Included among these documents is a letter dated

July 1, 1968, in which Brother Gray wrote to Brother Woulfe concerning Brother

Woulfe’s departure from St. Boniface. This letter states:

 I am sorry that things did not work out more appropriately at St. Boniface.
 At the same time ... the actual grace left by this unusual situation may be
 one which helps you to confront and overcome the problem, which if left
 untended, would eventually become a serious one for religious life ....

[Emphasis added.]

 In addition, there was a letter from Brother Gray to Brother Woulfe dated July 28,

1970 – in other words, just prior to the year in which Doe alleges Brother Woulfe abused

him – notifying Brother Woulfe that he would be kept at Chaminade for the coming

school year despite the Provincial Council’s unspecified “considerable misgivings and

reservations.” If the jury infers that Brother Gray’s references to Brother Woulfe’s

“unusual situation” and “problem” that could “eventually become a serious one,” and to

the Provincial Council’s “considerable misgivings and reservations” are coded references

to (and, therefore, proof of knowledge of) Brother Woulfe’s prior acts of sexual abuse,

the knowledge and intentional disregard elements of Doe’s cause of action are

12
 Chaminade argues the records in Brother Woulfe’s personnel file are inadmissible hearsay.
This argument is without merit as it appears likely these documents will be admitted as business
records pursuant to section 490.680, RSMo 2016. See CACH, LLC v. Askew, 358 S.W.3d 58, 63
(Mo. banc 2012) (quoting § 490.680).

 14
established. But it is for a jury, not this Court, to decide whether to draw that inference

from these letters.

 To help the jury understand these documents and other evidence in the case, Doe

expects to offer the testimony of Father Doyle, who has spent more than 30 years

reviewing thousands of priests’ personnel files, including those of hundreds of priests

against whom sexual abuse allegations have been made. Chaminade contends this

evidence is inadmissible and, without it, the jury cannot be permitted to speculate about

what Brother Gray meant. The Court disagrees.

 Father Doyle is a Catholic priest with extensive knowledge and experience of the

problem of sexual abuse in the Catholic Church. Doe offers his testimony, not as a fact

witness with personal knowledge of any disputed fact – but as an expert. The question of

whether evidence is admissible on this ground is governed by section 490.065.2(1), 13

which provides:

 (1) A witness who is qualified as an expert by knowledge, skill, experience,
 training, or education may testify in the form of an opinion or otherwise if:
 (a) The expert's scientific, technical, or other specialized knowledge will
 help the trier of fact to understand the evidence or to determine a fact in
 issue;
 (b) The testimony is based on sufficient facts or data;
 (c) The testimony is the product of reliable principles and methods; and
 (d) The expert has reliably applied the principles and methods to the facts
 of the case ....

 Father Doyle meets this test. Father Doyle was qualified through his knowledge,

experience, and education with respect to the manner and means of encoding specific

13
 All statutory references are to RSMo Supp. 2017 unless otherwise noted.

 15
information in personnel files maintained by various Catholic institutions concerning

sexual abuse by clergy. He holds a Pontifical Doctorate in Canon Law and was ordained

as a Catholic priest. He has reviewed several hundred personnel files of clergy accused

of sexual abuse – and thousands of personnel files for priests generally. In particular,

Father Doyle has considerable knowledge and experience bearing precisely on the issue

the jury will confront, i.e., what will (and will not) appear in personnel records when a

priest has committed acts of sexual abuse and, if reference to such conduct is made, the

form such references will take. Accordingly, Father Doyle’s testimony is admissible

under section 490.065.2(1).

 The question, then, is whether the undisputed evidence in the case plus Father

Doyle’s testimony are sufficient for the jury to find for Doe on the disputed elements of

his claim for intentional failure to supervise. Father Doyle’s expert report contains the

following:

 b. The Marianist leadership received notice of inappropriate sexual contact
 with minors by Brother Woulfe in 1968. This is reflected in a letter from
 Brother James Gray, Director of Education to Brother Woulfe dated July 1,
 1968.

 c. The second paragraph of the above cited letter refers to the sexual
 activity. It does not address it directly. Rather, it is written in the
 euphemistic or coded language that has been and continues to be
 commonly used by Catholic bishops, religious superiors and other clerics,
 when referring to sexual abuse with minors.

 d. Several documents refer to Brother Woulfe’s consistent absence from
 community prayers and from Mass. This is alluded to in the above cited
 paragraph. However, the reference by Brother Gray that “things did not
 work out more appropriately at St. Boniface” does not refer to Woulfe’s
 absence from community exercises. Brother Gray refers to “this unusual
 situation.” It is not unusual that members of religious communities

 16
 intentionally absent themselves from common prayers from time to time
 or even for prolonged periods of time. This does not in any way
 constitute an unusual situation. Also, members of religious communities
 were not sent to mental health facilities such as the Paraclete Fathers
 foundation in New Mexico, not for attending community prayers.

 e. In my extended experience in reviewing several hundred personnel
 files of clergy perpetrators I have found that problems such as alcohol
 abuse, absence from community meals, spiritual exercises or
 relationships with women are addressed directly. If the cleric or brother
 is involved with minors of either gender, it is not addressed directly.
 Rather, various forms of coded language are used.

 f. The provincial attempted to remove Woulfe from Chaminade in 1970.
 In my expert opinion the reason was based in knowledge of improper
 sexual behavior with students. A letter of July 28, 1970 states that the
 council decided to allow Woulfe to remain “with considerable misgivings
 and reservations” .... This phrase and other language in the letter leads
 me to the opinion that this attempted or threatened move was based on
 the knowledge of sexual abuse. The actual letter informing Brother
 Woulfe of the transfer is missing from the files produced however Woulfe’s
 response is included.... In this letter he says that no reasons were given for
 the transfer.

 g. Brother Woulfe was removed from Chaminade in 1977 because of a
 report of sexual abuse. There is no documentation in the files produced that
 refers to an accusation of sexual abuse. However, Fr. Hakenwerth,
 provincial at the time, stated in his deposition that he removed Woulfe
 because of an accusation of sexual abuse ....

[Emphasis added.]

 At Father Doyle’s deposition, counsel for Chaminade questioned Father Doyle at

length about the basis for these conclusions:

 Q. So you – you’re interpreting this letter from July 1, ’68 ... even though
 it doesn’t reference sexual contact, you read it as it actually does reference
 sexual contact?
 A. .... In the documentation that is habitually used by religious superiors
 and bishops and other clerics that I’ve reviewed over three decades, they
 never – I’ve never seen sexual abuse of minors directly referred to with
 the proper direct language.

 17
 It’s always referred to in some form of coded or euphemistic
language that is covering up or massage – or masking what the reality is,
and so I took – I read that paragraph and the wording of it told me that
this is what they’re talking about, and that’s my professional opinion.
....
Q. In other words, what he intended or what [Brother Gray’s] state of mind
was?
A. What he’s reporting to Brother John is the fact that – and John is John
Woulfe, he’s telling him –
Q. Yes, sir.
A. – about the situation why he’s being transferred, and that paragraph
refers to in my opinion some form of inappropriate sexual activity with
minors.
Q. And what is in that paragraph that leads you to that?
A. Let me read it (quote as read):
 I am sorry that things did not work out more appropriately at St.
 Boniface. At the same time, as I mentioned to you on the phone, the
 actual grace left by this unusual situation may be one which helps
 you to confront and overcome the problem which, if left unattended,
 would eventually become a serious one for religious life; that our
 obligations of religious observances and exercises, while not to be
 fulfilled mechanistically like little children stepping on the cracks of
 a sidewalk day after day, do remain fundamental obligations, and if
 our observances, etc.
But that first part of that sentence where he speaks about the serious
ramifications for religious life were part of what clued me to the fact that I
think they’re referring to sexual abuse.
Q. You think they are?
A. Yeah. It’s my opinion that they are. I don’t have metaphysical
certitude of that because I haven’t interviewed Brother Gray.
Q. Well, Brother Gray is dead. Are you aware of that?
A. Then I’m not ever going to be able to talk to them.
Q. And you’re not ever going to know for certain what Brother Gray
intended to convey in this letter, are you, sir?
A. No, that’s why I consider it an opinion.
....
Q. And so your opinion to sum it up in that second paragraph, because it
references a serious issue with respect to religious life, you interpret that as
sexual contact with minors?
A. That’s right.
....
Q. [Y]ou heard some testimony, didn’t you, sir, about Brother Woulfe’s
failure to observe mass and so forth?

 18
A. That’s right.
Q. And to attend daily prayers?
A. That’s right.
Q. Wouldn’t that be related to religious life?
A. Yes, it is.
Q. All right. And isn’t it possible, sir, that the reference to religious life
could have pointed to Brother Woulfe’s failure to regularly observe
religious obligations such as daily mass and daily prayer?
A. That’s mentioned directly to him and about him in several other
documents.
Q. Yes, sir.
A. This I don’t think – it may – the latter part, yes, but observance of the
vows is part of religious life as well.
Q. Sure.
A. And I don’t believe this refers to – because not going to mass or not
going to daily prayers is very common in religious orders. It happens all
the time. For a number of reasons. In his case he simply was negligent,
which is not unusual. And that’s not referred – that’s not something that
causes – you know, it’s not an unusual situation, and it’s not something
that would eventually become a serious one for religious life.
Q. Well, couldn’t it become a serious one for religious life if a member of
the order is not attending daily prayer or daily mass on a regular basis at all
for a prolonged period of time?
A. For him, but not for the community.
Q. I’m not sure I understood what you just said.
A. This says serious problem for religious life. They would have said your
religious life. As I said, my opinion stands that that is a reference to
inappropriate sexual activity with children. It’s euphemistically set forth.
Q. How do you know that doesn’t reference Woulfe’s religious life?
A. I don’t know. I’m not sure, but my opinion is it doesn’t.
Q. Okay. But the only information that you have from the file materials
that you’ve looked at in this case related to Woulfe’s religious life is that
Woulfe had an issue going to mass and observing daily prayers on a regular
basis?
A. That’s right.
Q. And that’s documented?
A. That’s documented.
Q. And that has nothing to do with sexual abuse, agreed? ....
A. I agree.
Q. .... You say in paragraph D of your opinions (quote as read):
 It’s not unusual that members of religious communities intentionally
 absent themselves from common prayers from time to time or even
 prolonged periods of time.

 19
I think you just talked about that a minute ago.
A. Yes.
Q. What’s your basis for saying that?
A. My experience.
....
Q. Okay. If we can turn back to your report I hope you have in front of
you, Father, you say in paragraph E (quote as read):
 In my extended experience in reviewing several hundred personnel
 files of clergy perpetrators I have found that problems such as
 alcohol abuse, absence from community meals, spiritual exercises,
 or relationships with women are addressed directly.
When you say addressed directly, what do you mean?
A. That means if there’s documentation, memos, if there had been letters
referring to those issues such as there are here with regard to community
life, there – there’s no euphemistic language.
Q. Okay.
A. It’s – it’s pretty clear that you know what they’re talking about.
Q. All right. So if there was a problem with alcoholism, even back in the
sixties and seventies, that would be documented in the file?
A. It could be. Possibly. Generally it was, but not always.
Q. Not always. How about – you talk about relationships with women. If
there was a religious or member of the order involved in relationship with
women, that would be directly noted in the file?
A. Sometimes, but not always.
Q. How is any of that relevant to your opinions in this case?
A. It’s relevant because I’m setting up a contrast between the
inappropriate behavior in certain areas, which was directly – directly
referred to, and my experience which says when that inappropriate
behavior involves inappropriate sexual contact with minors, it is almost
always used – described euphemistically.
Q. Okay. But you say also failures in religious life, absence from
community meals, spiritual exercises, etc., that was typically addressed
directly?
A. Yeah.
Q. Back in the sixties and seventies?
A. That’s correct.
Q. And it was addressed directly in Woulf’'s case, wasn’t it?
A. That’s right. That’s all I'm trying to say.
....
Q. [A]nd is there any reference in Brother Gray’s July 28th, 1970 letter ...
to improper sexual behavior with students?
A. No, there is not.

 20
 Q. And your – you intend to offer an opinion in this case, sir, that Brother
 Gray, the deceased author of this letter, in July 28, 1970 intended to convey
 knowledge of improper sexual behavior with students by virtue of his
 writing that, quote, there are considerable – with considerable misgivings
 and reservations the council met yesterday and decided you shall stay at
 Chaminade?
 A. [Y]es.
 ....
 Q. Okay. All right. Just to be clear, so you – you intend to offer what
 Brother Gray meant by his writing this letter?
 A. That’s right. There’s no reasons given for the transfer.
 Q. I understand. You intend to offer an opinion as to what his state of
 mind was when he authored this letter, Brother Gray?
 A. I’m just offering an opinion that the words in the letter indicate to me
 that it’s in reference to – my opinion is that it’s in reference to sexual –
 inappropriate sexual behavior with students.
 Q. Right. And that’s what he intended to convey, Brother Gray, when he
 wrote this letter?
 A. That’s right. That’s right.
 Q. His intent would be his state of mind, agree?
 A. Yes. I guess so. I –
 ....
 Q. Isn’t it possible, Father, that there was another reason that Brother
 Woulfe was going to be transferred other than sexual abuse of minors?
 A. Yes, it’s possible.
 Q. Okay. Subparagraph G you say (quote as 15 read):
 Brother Woulfe was removed from Chaminade in 1977 because of
 report of sexual abuse.
 Is that based on Father Hakenwerth’s deposition testimony?
 A. That’s his admission, yes.
 Q. You say there’s no documentation in the files produced that refers to an
 accusation of sexual abuse. What’s the significance of that?
 A. The significance of that is the fact that they didn’t put anything in the
 files, they didn’t record it, which is not uncommon that there would be
 any direct reference to sexual abuse in a man’s file in this time period.
 Q. Do you think it was appropriate for Father Hakenwerth to remove
 Woulfe in ’77 when he received that report?
 A. Absolutely.

[Emphasis added.]

 21
 Father Doyle’s evidence, if believed and credited by the jury, provides a sufficient

basis to infer from the other evidence (including what is and is not in Brother Woulfe’s

personnel records) that Chaminade knew – before Brother Woulfe’s alleged abuse of Doe

– that the risk he would commit such abuse in the future was certain or substantially

certain and that Chaminade disregarded that known risk. Father Doyle’s testimony, if

believed and credited by the jury, permits the jury to exclude other explanations for the

references by Brother Gray because, according to Father Doyle, when a member of the

clergy has problems such as alcohol abuse, absence from community meals, spiritual

exercises, or inappropriate consensual relationships with adult men or women, references

to those problems in personnel records are direct and forthright. But, when the reference

is to sexual abuse of children, personnel records resort to referring to unidentified

“problems” and similar vague or oblique euphemisms.

 Chaminade contends Father Doyle’s testimony invades the province of the jury

and, for that reason, must be disregarded. This is incorrect. Plainly, even an expert is not

permitted to testify on a question committed to the exclusive province of the jury. State

v. Churchhill, 98 S.W.3d 536, 538-39 (Mo. banc 2003). Here, Father Doyle does not

profess to have firsthand knowledge of what Brother Gray was (or was not) referring to

when he wrote Brother Woulfe in 1968 and 1970, and nothing in his testimony would

suggest to the jury that he does. Instead, Father Doyle – based on his knowledge and

experience – will explain to the jury what vague and indirect references to a priest’s

“problem” similar to those made by Brother Gray have meant in the hundreds of

personnel files of abusive priests he has reviewed in the past and what he believes they

 22
likely signify in this case. In the end, however, it is for the jury – and only the jury – to

decide what Brother Gray knew and was referring to in his letters to Brother Woulfe.

 In essence, Father Doyle contends that a “code” developed in the Catholic church

for referencing a priest’s sexual abuse of children in personnel files and other records and

that he understands – and can help the jury understand – that code. Such expert

testimony has been admitted in analogous situations. In State v. Seddens, 878 S.W.2d 89,

(Mo. App. 1994), an expert witness was allowed to testify to the “practices, symbols,

terminology, and history of particular street gangs.” Id. at 92-93. Using a picture, the

witness identified graffiti used by these gangs to mark their territory generally and that

was found at the scene of a drive-by shooting at issue in that case. Id. at 93. This

evidence was admissible because it aided the jury in understanding the implications of

those markings and other facts in evidence and inferring from them that the drive-by

shooting in which a bystander was killed was motivated by a gang turf war. Id. 14

 Here, Father Doyle does not purport to know – let alone seek to tell the jury –

what Brother Gray knew when he wrote his letters to Brother Woulfe in 1968 and 1970,

any more than the expert in Seddens sought to tell the jury what the tagger was thinking

when spraying the graffiti at issue in that case. Instead, the testimony of both experts

provides the respective juries with information for them to use in deciding how to

14
 See also United States v. Moralez, 808 F.3d 362, 365 (8th Cir. 2015) (recognizing expert
testimony may be admitted under Federal Rule of Evidence 702 and Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993), to assist jurors in understanding drug jargon or other
coded language); United States v. Vera, 770 F.3d 1232, 1241 (9th Cir. 2014) (same).

 23
interpret the particular writing in their respective cases and, ultimately, what reasonable

inference, if any, they should draw from those writings.

 To be clear, the jury does not have to believe Father Doyle or believe anything he

has to say applies to the records and other evidence in this case. Using all of the evidence

before them, including Father Doyle’s expert testimony, the jury may infer Chaminade

knew the risk that Brother Woulfe would visit sexual abuse upon a student was certain or

substantially certain and – if so – whether Chaminade disregarded that known risk. And

they may not. The only issue before this Court, and the issue on which the circuit court

erred, is whether Father Doyle’s testimony (taken together with all the other evidence) is

sufficient for the jury to draw that inference reasonably if persuaded to do so. This Court

concludes there is and summary judgment for Chaminade on Doe’s claim of intentional

failure to supervise was error.

 Conclusion

 For the reasons set forth above, the grant of summary judgment is affirmed in part,

vacated in part, and the case is remanded. 15

 _____________________________
 Paul C. Wilson, Judge

Draper, C.J., Russell, Powell, Breckenridge,
and Fischer, JJ., concur.

15
 Doe has not challenged on appeal the circuit court’s granting of summary judgment with
respect to Counts I, V, and VI; accordingly, the judgment with respect to those counts is
affirmed.

 24